## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,                                   Cr. No. 19-4439 JAP

v.

JOSEPH M. PEREZ,

     Defendant.

## **MEMORANDUM OPINION AND ORDER**

On November 11, 2019, at a bus station in Albuquerque, New Mexico, Drug Enforcement Administration Special Agent Jarrell Perry asked Defendant Joseph M. Perez if he would consent to a pat down search of his person. Defendant agreed. During the pat down, Agent Perry felt a bundle strapped to Defendant's lower back. The contents of that bundle later field tested positive for heroin. On December 3, 2019, a federal grand jury indicted Defendant on one count of unlawfully, knowingly, and intentionally possessing with intent to distribute 100 grams and more of a mixture and substance containing a detectible amount of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).[1] Now, Defendant seeks to suppress the evidence found during the search.[2] The Court concludes that the discovery of the evidence was the result of a lawful search and will thus deny Defendant's Motion.

---

[1] *See* INDICTMENT (Doc. 12).
[2] *See* MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT THEREOF ("Motion") (Doc. 29); RESPONSE OF THE UNITED STATES TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE ("Response") (Doc. 33).

BACKGROUND

On June 11, 2020, the Court held a hearing on the Motion to Suppress.[3] Assistant United States Attorney Paul Spiers represented Plaintiff, United States of America; Defendant was present and was represented by Attorney Joe Romero. DEA Special Agents Kirk Lemmon and Jarrell Perry testified, as did Defendant. During the hearing, the Court found Defendant's testimony credible and forthright. The following constitutes the Court's essential findings of fact under Federal Rule of Criminal Procedure 12(d).

On November 11, 2019, Agent Perry and Agent Lemmon were conducting drug interdiction at the Greyhound bus station in Albuquerque, New Mexico. Tr. at 5:1–9, 17–20. Both agents wore plainclothes, and although they were armed, they concealed their weapons under their clothing. *Id.* at 6:16–23 (Agent Lemmon); *Id.* at 24:16, 24–25 (Agent Perry).

The agents were at the Greyhound bus station to check an eastbound bus that makes a regularly scheduled stop in Albuquerque. *Id.* at 19:14–15. During the stop, passengers deboarded the bus, and Agent Perry and Agent Lemmon then walked onboard. *Id.* at 15:6–7. Agent Lemmon positioned himself at the front of the bus, while Agent Perry went to the rear of the bus and faced towards the front. *Id.* at 21:17–19. Agent Perry does this so that he can talk with passengers as they board the bus. *Id.* at 23:8–16 (describing Agent Perry's placement and what he describes as "consensual encounters"). As passengers began boarding, Agent Lemmon observed Agent Perry's interactions with them from his position at the front of the bus. *Id.* at 13:19–25.

Defendant had been a passenger and had gotten off the bus to get some food and stretch his legs. *Id.* at 70:20–21. Prior to re-boarding, Defendant saw Agent Perry and Agent Lemmon board the bus, which concerned him. *Id.* at 72:12–14. When Defendant attempted to board, Agent

---

[3] *See* CLERK'S MINUTES entered June 15, 2020 (Doc. 57).

Lemmon was standing in the front of the bus, which caused Defendant to ask Agent Lemmon to excuse him as he passed by. *Id.* at 72:14–17. Defendant then observed Agent Perry at the rear of the bus. *Id.* at 72:18–19. Defendant testified that at that moment he wanted to get off the bus, but he did not because he had previously seen Agent Lemmon at the front of the bus blocking the exit. *Id.* at 72:22–25. So instead, Defendant decided to put on his earphones and attempt to watch a movie. *Id.* at 73:4–6.[4]

Agent Perry spoke with multiple passengers, who had taken seats near the rear of the bus, about their travel. *Id.* at 23:14–18. As he spoke to passengers, Agent Perry moved forward and eventually got to Defendant's row of seats about midway on the bus. *Id.* at 25:20–21. When he reached Defendant, Agent Perry tapped Defendant's right shoulder and gestured for Defendant to remove his earphones. *Id.* at 73:8–11. When Defendant complied, Agent Perry identified himself as a police officer—despite being a DEA Special Agent—and asked if he could speak with Defendant. *Id.* at 73:18–20. Defendant responded in the affirmative. *Id.*

Agent Perry and Defendant both testified about Agent Perry's positioning during their conversation. Agent Perry testified that he stood to the rear of Defendant's seat. *Id.* at 56:3. Defendant testified, however, that Agent Perry stood in the aisleway adjacent to the row in which Defendant was seated. *Id.* at 74:7–9. Agent Lemmon's testimony supports Defendant's description of Agent Perry's position. *Id.* at 12:8–9. Thus, the Court finds that Agent Perry stood in the aisle directly next to the row in which Defendant was seated. Defendant had a window seat—the aisle seat next to him remained empty. *Id.* at 71:16–18, 22–24.

---

[4] Agent Perry testified that he did not recall Defendant wearing earphones. Tr. at 51:2. Nevertheless, he continued to testify unequivocally that "[Defendant] wasn't wearing earphones when I spoke to him on the bus." *Id.* at 52:10–11. Given Defense Exhibit B, Receipt for Cash or Other Items, lists earphones as an item seized from Defendant, and in light of Agent Perry's inconstant testimony, the Court credits Defendant's version of events.

On Agent Perry's prompting, Defendant explained that he was traveling from his home in San Diego, California, to Oklahoma City, Oklahoma, where he would be visiting family for approximately two weeks. Doc. 33-1 at 16:1–10.[5] Agent Perry asked if Defendant had any luggage on the bus. *Id.* at 16:13. Defendant explained that he had luggage under the bus, but not with him at his seat. *Id.* at 16:13–18. Next, this colloquy occurred:

> Agent Perry: All right. And you don't have anything around your waist . . .
>
> Defendant: No.
>
> Agent Perry: . . . or on your body, do you?
>
> Defendant: No.
>
> Agent Perry: Give me permission just to pat you down . . . [6]
>
> Defendant: Yeah, man.[7]
>
> Agent Perry: . . . for contraband? Thank you.

*Id.* at 16:19, 17:1–6.

Next, Agent Perry asked Defendant: "Can you lean forward?" CD at 00:07:25. Defendant responded: "Yeah." *Id.* at 00:07:26. Two seconds later, Agent Perry instructed Defendant to "lean forward"—this time not phrased as a question. *Id.* at 00:07:28. Five seconds of silence followed that instruction. *Id.* at 00:07:28–33. Then Agent Perry instructed Defendant to "stand up and put your hands right here." *Id.* at 00:07:34. When Defendant complied, Agent Perry put handcuffs on him. *Id.* at 00:07:38–44 (sound of handcuffs being tightened).

Agent Perry's and Defendant's testimony vary about what happened during the nine

---

[5] An audio recording of the encounter, which is somewhat difficult to hear, was admitted at the hearing as Government Exhibit 1. When the Court cites to Doc. 33-1, a transcript of the recording, this represents the Court's findings that the transcript accurately reflects what can be heard on the audio recording. Notably, Defendant does not dispute the accuracy of the transcript for purposes of this Motion. Tr. at 33:12–25.

[6] At this point, Defendant testified that Agent Perry had begun leaning towards him. *Id.* at 75:13–15.

[7] Defendant's response is difficult to hear on the audio recording. Nevertheless, Defendant concedes that he responded: "Yeah, man." Tr. at 97:22.

seconds between when Agent Perry asked Defendant if he could lean forward and when Agent Perry instructed him to stand up. Defendant testified that although he responded "yeah" when Agent Perry asked him if he could lean forward, CD at 00:07:26, he actually froze in his seat, Tr. at 75:8. Instead of leaning forward, Defendant pushed out his chest and stiffened, thereby indicating through his body language that he did not want to lean forward. *Id.* at 75:8–10; 76:8–9. Defendant further testified that when Agent Perry stated again "lean forward," CD at 00:07:28, Agent Perry placed his right hand on Defendant's upper back and physically moved Defendant forward so that he could pat down Defendant's back, Tr. at 78:17–22. Thus, according to Defendant, Agent Perry only felt the object affixed to his back after Agent Perry pushed him forward. *Id.* at 78:20–22.

For his part, Agent Perry testified that he stepped towards Defendant and began to pat down Defendant's waist immediately after receiving Defendant's consent. *Id.* at 57:12–14, 28:17. Having completed that task, he asked if Defendant could lean forward. *Id.* at 28:18; CD at 00:07:25. Agent Perry testified that after Defendant said "yeah," CD at 00:07:26, Defendant leaned forward to give Agent Perry access to his back, Tr. at 28:18–20. Agent Perry further testified that following his question, "Can you lean forward?" CD at 00:07:25, and Defendant's compliance, he felt a hard object secured to Defendant's back, Tr. at 28:23–25. According to Agent Perry, he then instructed Defendant to lean forward, CD at 00:07:28, and stand up, *id.* at 00:07:34., to enable Defendant's arrest, *see* Tr. at 59:1–4; 101:10–13.

The Court has carefully studied the audio recording of the encounter and has already found Defendant to be a credible witness. The Court further finds that the timing of Agent Perry's statement for Defendant to "lean forward" and his subsequent instruction to "stand up" is inconsistent with his testimony that he had already completed the pat down and was directing

Defendant to lean forward to enable Defendant's arrest. Indeed, Agent Perry claims to have discovered the object affixed to Defendant's back during the two seconds between asking Defendant to lean forward, CD at 00:07:25, and instructing Defendant to lean forward, *id.* at 00:07:28. Yet, five seconds of silence followed Agent Perry's instruction to lean forward. *Id.* at 00:07:28–33. And only then did Agent Perry, speaking very quickly, instruct Defendant to "stand up and put your hands right here" for an arrest. *Id.* at 00:07:34. Based on that timing, the Court draws the reasonable inference that Agent Perry continued to pat down Defendant after he instructed Defendant to "lean forward." Because the Court finds that the audio recording supports Defendant's testimony, the Court further finds that Agent Perry pushed Defendant forward so that he could pat down Defendant's back. Tr. at 78:17–22.

Agent Perry testified that he knew upon feeling the object secured to Defendant's back that it contained illegal narcotics. Tr. at 28:17–25, 29:1–2. Agent Perry has worked for the DEA for approximately 21 years, during which time he has conducted hundreds of pat down searches. *Id.* at 18:18, 19:1–3. Moreover, throughout his career, Agent Perry has felt colostomy bags, money bags, and bundles of illegal narcotics during pat down searches. *Id.* at 18:18, 29:22–25, 30:1–2. Based on that experience, Agent Perry knew—because of its location, concealment method, and hardness—that the object fixed to Defendant's back was illegal narcotics and not something more innocent. *Id.*

Agent Lemmon and Agent Perry escorted Defendant off the bus. *Id.* at 9:10–14. Agent Perry then discovered a second object secured near Defendant's groin. *Id.* at 31:12–18. The object secured to Defendant's back tested positive for heroin. *Id.* at 31:22–25. Meanwhile, the object secured to Defendant's groin contained acetaminophen pills. *Id.* at 32:1–4.

DISCUSSION

**A. Initial encounter and consent to the pat down**

An individual has been "seized" for Fourth Amendment purposes when a reasonable person in the individual's position would not feel free to terminate her encounter with the police and leave. *See Halley v. Huckaby*, 902 F.3d 1136, 1145 (10th Cir. 2018). Such a seizure must be supported by probable cause. *Id.* If, however, "one voluntarily answers an agent's non-coercive questions, the conversation falls outside the scope of the Fourth Amendment." *United States v. Armando Martinez*, 792 F. App'x 610, 611 (10th Cir. 2019).

Before the Court "may admit evidence resulting from a consent search, it must determine from the totality of circumstances that (1) the defendant's consent was voluntary and (2) the search did not exceed the scope of the consent." *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991). "The government bears the burden on the voluntariness issue." *Id.* (citing *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir. 1977)). "First, it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.' Second, the government must show that the police did not coerce the defendant into granting his consent." *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citation omitted) (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

The Tenth Circuit has "enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police." *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017). Those factors include:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether

> or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* (citation omitted). "Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *Id.* (internal quotation marks and citation omitted). The Court evaluates these factors using an objective standard. *United States v. Easley*, 911 F.3d 1074, 1079 (10th Cir. 2018), *cert. denied,* 139 S. Ct. 1644, 203 L. Ed. 2d 917 (2019).

Agent Perry's encounter with Defendant can be broken down into to two stages: (1) the initial encounter and questioning, and (2) Defendant's consent to a pat down.

With respect to the first stage, the Court concludes that Defendant was not unlawfully seized and that the encounter was consensual. First, only Agent Perry approached Defendant, while Agent Lemmon remained at the front of the bus. Thus, the "threatening presence of multiple officers" did not exist. *United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012). Moreover, neither Agent Perry nor Agent Lemmon brandished a weapon. Rather, they were both dressed in plainclothes with their weapons concealed. *See Hernandez*, 847 F.3d at 1264. Further, Agent Perry did not use aggressive language while speaking with Defendant. Agent Perry addressed Defendant as "sir," was polite when making requests, and thanked Defendant for his cooperation. Agent Perry also kept his voice low and used non-threatening language. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (explaining that the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory" is one factor in determining whether an encounter was not consensual). Further, the encounter occurred on a Greyhound bus within view of the other passengers. *See Easley*, 911 F.3d at 1080. That sequence of events confirms that Defendant's consent to engage with Agent Perry was freely and voluntarily given.

8

Two relevant facts caution against a conclusion that the encounter was consensual, although the Court ultimately finds them unpersuasive. First, both Agent Perry and Agent Lemmon blocked Defendant's egress at various points. Defendant argues that the Court should consider the confining nature of the bus on the voluntariness of his consent. Tr. at 96:1. But while the "cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary," this single factor is not determinative. *Fla. v. Bostick*, 501 U.S. 429, 439, (1991); *see also United States v. Garcia-Guzman*, 432 F. Supp. 3d 1324, 1339–40 (D.N.M. 2020) ("When an encounter with police occurs on a bus or train, the relevant inquiry is not whether a reasonable passenger would feel free to leave the bus or train, but rather, whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." (internal quotation marks omitted)). Second, Agent Perry did not explain to Defendant that he did not have to speak with him. The Supreme Court, however, has "expressly rejected [a] rule which made all police encounters non-consensual where officers failed to advise individuals of their right not to comply with their requests." *United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) (citing *United States v. Drayton*, 536 U.S. 194, 203 (2002). Accordingly, Agent Perry's failure to so advise Defendant carries little weight in the Court's analysis. Neither of those factors (nor the two factors combined) convince the Court that Agent Perry engaged in coercive actions that undermined the voluntariness of Defendant's consent to engage in conversation.

The Court likewise concludes that Defendant was not unlawfully seized when he consented to a pat down. All the same factors that existed during their initial encounter continued to be true. And Defendant agreed to allow Agent Perry to conduct a pat down. To be sure, Defendant testified that Agent Perry was already leaning towards him before he consented to a pat down. Tr. at 75:13–15. But the Court finds that factor alone does not establish that his consent was coerced. *Cf.*

Case 1:19-cr-04439-JAP   Document 58   Filed 07/01/20   Page 10 of 13


*Hernandez*, 847 F.3d at 1264 ("Although no single factor is dispositive, the *strong* presence of two or three factors may be sufficient to support the conclusion a seizure occurred." (emphasis added)). Nevertheless, Defendant argues that he was paralyzed with fear during the encounter with Agent Perry. Tr. at 75:8–10, 78:23–25.[8] Defendant's subjective fear, however, does not guide the Court's analysis. Rather, the Court must determine whether a reasonable person in Defendant's position would have felt free to terminate the encounter. *Easley*, 911 F.3d at 1079. Based on the factors described above, the Court concludes that a reasonable person would have felt free to terminate the encounter.

The Court concludes that Agent Perry's interaction with Defendant was consensual. Accordingly, the Fourth Amendment's strictures were not implicated.

### B.  Scope of consent

Defendant argues that even if he consented to a pat down search, Agent Perry's pat down of the portion of his back containing the bundle exceeded the scope of his consent. *See* Doc. 29 at 9. The Court concludes that Agent Perry's search of Defendant's back did not exceed the scope of Defendant's consent to search.

The scope of consent "is defined by the search's express object and is limited by the breadth of the consent given." *United States v. Freeman*, No. 01-CR-496 JP, 2002 WL 35650115, at *4 (D.N.M. Feb. 13, 2002) (citing *United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997)). Courts apply an objective reasonableness test that asks what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect," *Elliott*, 107 F.3d at 815 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)), and then make a factual determination about whether the search exceeded the scope of consent based on the totality of the circumstances, *see*

---

[8] The Court believes Defendant's testimony that he was in fear during his encounter with Agent Perry.

*United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). That said, "a defendant's failure to limit the scope of a general authorization to search . . . is an indication the search was within the scope of consent." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).

Here, Agent Perry requested to conduct a pat down for contraband. Doc. 33-1 at 4, 6. Defendant agreed. *Id.* at 5. Then Agent Perry asked Defendant if he would lean forward. *Id.* at 6. Again, Defendant agreed. *Id.* at 7. This time, however, instead of complying by leaning forward, Defendant froze and stiffened his body. Tr. at 75:8–10; 76:8–9. The Court concludes that a reasonable person having heard Defendant consent to lean forward, would understand the scope of the pat down to include Defendant's back. Defendant's subsequent body language—i.e., stiffening and not leaning forward—was not enough to signal to a reasonable person that Defendant was limiting the scope of the oral consent which he had just given. Indeed, a person's "failure to object when the search exceeds what he later claims was a more limited consent[ ] is an indication the search was within the scope of consent," when, as here, the "defendant initially gave a *general* authorization to search." *United States v. Wald*, 216 F.3d 1222, 1228 (10th Cir. 2000) (internal quotation marks omitted) (emphasis in original). Significantly, although Defendant stiffened his back, he did not retract his earlier oral consent; he did not tell Agent Perry to stop either touching him or feeling his lower back. And while the Court is troubled by Agent Perry's actions—i.e., physically pushing Defendant forward to access his back—the Court concludes that Agent Perry's actions to effectuate the pat down in this case were reasonable. Thus, Agent Perry's pat down of Defendant's back was within the scope of Defendant's consent.

## C. Probable cause

The Constitution requires that arrests by law enforcement officers be supported by probable cause. *See* U.S. Const. amend. IV; *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th

Cir. 1998). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (quoting *Jones v. City & Cty. of Denver, Colo.*, 854 F.2d 1206, 1210 (10th Cir. 1988)). In other words, probable cause requires a "substantial probability that a crime has been committed and that a specific individual committed a crime." *St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985).

When Agent Perry felt the object on Defendant's back, he had probable cause to arrest Defendant. Indeed, Agent Perry testified that immediately upon feeling the object affixed to Defendant's back, he knew with certainty that the object contained illegal narcotics. Tr. at 28:17–25, 29:1–2. Agent Perry reached this conclusion because prior to the pat down, Defendant had specifically said that he did not have anything hidden around his waist, and it immediately became apparent that Defendant was not truthful. *Id.* at 28:10–14. Moreover, in Agent Perry's approximately 21 years with the DEA, he has felt colostomy bags, money bags, and bundles of illegal narcotics during pat down searches. *Id.* at 18:18, 29:22–25, 30:1–2. Based on that experience, Agent Perry knew that the object fixed to Defendant's back was neither a colostomy bag nor a money bag because of its location, concealment method, and hardness. *Id.*; *see also United States v. Sparks*, 291 F.3d 683, 688 (10th Cir. 2002) ("Although [the defendant's] actions could theoretically have been innocent, we believe a prudent, cautious and trained police officer more likely would have construed those actions as indicating [that the defendant] was [involved in a crime]."). The Court will give deference to Agent Perry's experience. *See Ornelas v. United States*, 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.").

Taken as a whole, the Court concludes that the facts and circumstances within Agent Perry's knowledge were sufficient to lead a prudent person to believe that Defendant was committing a crime. *See Fay*, 45 F.3d at 1476.

IT IS THEREFORE ORDERED THAT Defendant's MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT THEREOF (Doc. 29) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE